## In re U. S. Bank & Trust Company

*Aarons, Weinstein, Stone & Goldhaber, John R. K. Scott, William T. Connor, Louis Goodfriend* and *Alexander Schamban,* for exceptants.

*Charles Woods Coulston, Clarence M. Freedman* and *Frank Glatfelter,* for Secretary of Banking.

GORDON, JR., J., October 22, 1934.—The second and partial account of the Secretary of Banking, receiver in possession of U. S. Bank & Trust Company,

is now before us for audit. Certain exceptions were filed by various claimants, and the account was confirmed by decree of this court, entered October 8, 1934, as to all matters contained therein except those covered by the exceptions now to be decided.

### Claim of Sarbacker & Siegal

The first exception relates to a claim for a preference, in the sum of $2,668.39, by George Sarbacker and Samuel Siegal, trading as Sarbacker & Siegal. The facts respecting this claim of preference were stated by counsel at the audit and appear in the notes of testimony. They need not be repeated here, however, as counsel for the accountant, after the facts were placed upon the record, agreed that the exception was well taken and should be sustained, and that Sarbacker & Siegal's claim should be allowed as a preferred claim. Accordingly, said exception is sustained, and the said claim is allowed as a preferred claim against the fund.

### Claims of Richmond Machine Company and Daub Brothers

In addition to the claim of Sarbacker & Siegal, the following claims of the same character were presented and similarly agreed to by counsel for the receiver: Richmond Machine Company, $820; Daub Brothers, $1,230. Said claims are therefore allowed as preferred claims against the fund.

Counsel for the receiver requests that the following claims, which are not admitted in the account, be allowed, as the receiver, after further investigation, is now satisfied of their validity and correctness. Said claims are therefore allowed as follows: Girogas Jochaderian, $28; John Larrisey Christmas Club, $25.50; Carl Shapiro, $54.05; Leon Lewis, $6.21.

### Claim of Daub Brothers

On the evening of December 23, 1929, the day before the bank closed, Daub Brothers deposited the sum of $2,500.95 in their account with the bank, which when the bank closed showed a credit balance of $5,393.68. The receiver therefore admits liability to Daub Brothers on their deposit account, pari passu with other depositors, in this amount. Daub Brothers, however, claim that as this balance includes the deposit of $2,500.95, above referred to, a preference in that amount should be allowed upon the grounds, first, that said deposit was accepted by the officials of the bank after it had been closed and taken over by the receiver, and, second, if that be not the case, when the bank was insolvent. Daub Brothers completely failed to present any evidence to sustain the foregoing contentions. Nothing was shown which would overturn the decision rendered by us, after full hearing, at the audit of the first account, in which we held that claims for a preference upon these grounds could not be allowed as the bank was not insolvent at the time such deposits were taken. Nothing having been shown to lead us to reverse our previous decision, the claim of the said Daub Brothers for a preference as to $2,500.95 is disallowed.

### Claim of Anna J. Sandler

Anna J. Sandler presented at the audit her claim for a deposit standing in her name at the time the bank was closed. The facts respecting this claim are as follows: Both Mrs. Sandler and her husband had deposit accounts in the bank. The husband's claim upon his account was allowed, and he received the 18 percent dividend heretofore paid to depositors by the receiver. With respect to Mrs. Sandler's account, the 18 percent dividend declared upon it was not paid to her but has been held and is scheduled in this account as a reserve.

The reason for this was that Mrs. Sandler's husband notified the receiver that the deposit in the name of his wife belonged to him. He submitted no proof of this contention to the receiver, however, and he has failed to appear and present his alleged claim before us. The deposit is in the name of Mrs. Sandler, and no evidence has been presented to show that it belongs to anyone else; it is presumptively hers, and she is therefore entitled to receive the 18 percent dividend heretofore declared in favor of her account and not yet paid to her, as well as any dividends that may hereafter be declared thereon. The claim of the said Anna J. Sandler to the deposit in question is therefore allowed, and her exception sustained.

### Claim of William M. Moldawer

This is a claim for $2,075, representing the proceeds of a sale by the Secretary of Banking of 100 shares of United States Electric Power Corporation stock, which the secretary sold and applied in reduction of the loan account of Henry W. Perlstein, a brother-in-law of the claimant. There are only two questions of fact in dispute between the parties, and as to these the case has been submitted to us upon depositions. All the other facts upon which the claim is based, including the amount of the claim, already stated, are not in dispute and have been agreed to in a stipulation filed of record. From the stipulation and depositions, we find the controlling facts of the case to be as follows: When the Secretary of Banking took possession of this bank, on December 24, 1929, he found among its records the deposit account of Henry W. Perlstein and also a loan account of the same depositor. In the loan account was a collateral note for $3,000 given by Perlstein to the bank, and in the collateral envelope accompanying it were two certificates of stock—one a street certificate for 100 shares of United States Electric Power Corporation, the stock here in dispute, and the other a certificate for 200 shares of National American Company stock, which concededly belonged to Perlstein. On March 26, 1930, the secretary sold all this collateral and applied the proceeds of the sale to the partial liquidation of Perlstein's loan account. At or about the time of the sale, the claimant, William M. Moldawer, presented to the secretary a reclamation petition, in which he demanded the 100 shares of United States Electric Power Corporation stock on the ground that it belonged to him, claiming that it had been wrongfully held by the bank as collateral for his brother-in-law's loan.

One of the two disputed questions of fact is whether this demand was made upon the secretary before or after the sale of the stock. From the depositions presented upon this question, we are inclined to the view that Moldawer's demand was presented to the secretary before the stock was sold. Although it appears that the Secretary of Banking's representative having charge of the matter directed a subordinate to cause the stock to be sold on the day before the sale was actually made, the records of the brokerage firm that sold it disclose that the latter received the order for sale at about 11 o'clock on the following day, and that the sale was made within the next hour. Moldawer's reclamation petition or claim was presented to the secretary on the day the stock was sold, about half an hour before the order was received by the broker. We therefore think that the demand was received by the Secretary of Banking prior to, and in time for his agents to have countermanded the order for the sale. We think, however, that the time at which the secretary was notified of Moldawer's claim is of no importance in the case. If the stock did not rightfully belong to Moldawer, he is entitled to nothing; if it did belong to him, he is entitled to the proceeds of its sale, regardless of whether it was sold before or after his demand was made upon the Secretary of Banking.

Moldawer's claim to ownership of the stock is based upon the following circumstances: In the month of September 1929, Mr. White, president of the bank, who appears to have been interested in promoting sales of the stock in question, strongly recommended it to Perlstein as an investment. Perlstein told White that he was not in a position himself to buy the stock. He, however, communicated White's recommendation to his brother-in-law, Moldawer, and urged the latter to buy. Moldawer told Perlstein that he did not have the ready money to purchase any stock, but suggested that, as Perlstein was indebted to him in the sum of $10,000, he would be willing to give Perlstein a credit for the purchase price of 100 shares of the stock if Perlstein would buy it for him. Perlstein agreed to this arrangement and communicated it to White. It may be noted here, parenthetically, that all the oral testimony respecting this transaction comes from Perlstein and Moldawer, White, the president of the bank, not being available as a witness. Having explained to White his arrangement with Moldawer, Perlstein directed White to purchase 100 shares of the stock for Moldawer, and White gave an order accordingly to his broker. The broker's records contain notations indicating that White directed the stock to be purchased for the account of Moldawer. This order was executed by the broker; the stock was bought for a little over $3,000, and a street certificate for 100 shares was delivered to the bank on October 8, 1929. On the same day, apparently as the result of a notice from White to Perlstein, the latter appeared at the bank and borrowed $3,000 from it on a collateral note, the bank crediting Perlstein's deposit account with the amount of the loan. Perlstein then delivered his check for the purchase of the stock to the bank, and the bank paid the broker with its own check in like amount. At the time the loan was made, Perlstein deposited as collateral 200 shares of National American stock, and the collateral note recites the deposit of that stock as well as the 100 shares of United States Electric Power Corporation stock. Perlstein testified that he did not deposit or authorize the bank to hold as collateral for the loan the 100 shares of stock in question, and that when he signed the note the stock was not recited in it. In partial corroboration of this testimony, an inspection of the note itself discloses that the name of the stock is written in an apparently different handwriting from that of the rest of the note, including the name of the National American stock deposited by Perlstein. This brings us to the second and only remaining disputed issue of fact in the case, namely, whether Perlstein deposited the stock as collateral for the loan at the time it was made, or whether, after the note was signed by Perlstein, it was altered without his consent by the irregular insertion in it of the name of the stock. On the one side of this dispute, we have the direct testimony of Perlstein that he neither intended to nor did use the stock as collateral for his loan, and that it was inserted in the collateral note without his consent after its execution and delivery by him to the bank. The difference in handwriting between the body of the note and the name of the stock and the manner in which it has been "squeezed in" ahead of the National American stock would tend to corroborate the testimony of Perlstein in this respect. On the other hand, although there is no evidence presented on behalf of the bank as to how the name of the stock came to be inserted in the note, all the circumstances of the case, apart from Perlstein's testimony, would seem to indicate that the stock was intended to be retained by the bank as collateral for the loan. It is entirely consistent with the facts to infer that, even if the name of the stock was inserted in the note after it was executed, it was probably so inserted in good faith and for the purpose of correcting the accidental omission of it in the preparation of the instrument. Look-

ing at the testimony alone, however, we would be inclined to the view that, since Perlstein's direct and positive testimony is uncontradicted, the stock was not put up or intended to be put up by him as collateral for his loan. Nevertheless, we think this question of fact is of little, if any, importance in the case, for the real question is not whether the stock was hypothecated by Perlstein with the bank but whether it belonged to Moldawer. If it was bought and received by the bank as agent for Moldawer, neither it nor Perlstein could have used it lawfully as security for the latter's loan. On the other hand, if the bank received the stock as agent for Perlstein, then Moldawer has no lawful claim to it, regardless of whether or not it was pledged by Perlstein for his loan.

The bank did not deliver the stock on October 8th, when it received it from the broker, to either Perlstein or Moldawer, nor does Perlstein appear to have given any direction to the bank with respect to its disposition. Thereafter, the bank retained possession of the stock until December 24, 1929, when the Secretary of Banking took over its affairs and found the stock in Perlstein's loan account. During this period of more than 2 months, neither Perlstein nor Moldawer made demand for the stock upon the bank. Both Moldawer and Perlstein sought to excuse their respective failures to demand the stock from the bank by asserting that each supposed that the other was in possession of it. However this may be, the fact is that neither asserted any right in it inconsistent with the bank's retention of it as collateral for the loan. So also, after the closing of the bank, they made no effort to secure the stock nor asserted any claim respecting it, until March of the following year—a period of almost 3 months—when the Secretary of Banking was about to sell it in liquidation of Perlstein's loan. It was then for the first time that Moldawer, supported by Perlstein, claimed the stock as his own under the private arrangement between them recited above.

The claimant contends that, when White ordered the stock in the name of Moldawer and thereafter received it from the broker, he acted as the agent of Moldawer and received it as such, and hence that, without Moldawer's authority, the bank had no right to use it as collateral for the loan. If it be true that the bank acted exclusively as Moldawer's agent in buying the stock, the conclusion contended for by the claimant necessarily follows, and the claim should be allowed. The facts recited above, however, disclose a fundamental situation which we think did not make the bank the agent of Moldawer in the purchase and receipt of the stock. Indeed, so far as Moldawer is concerned, there is no question of agency in the case. The arrangement between him and Perlstein did not constitute Perlstein his agent to buy the stock on his behalf; it was an arrangement by which he agreed to accept the stock in partial liquidation of his brother-in-law's loan from him, if and when his brother-in-law bought the stock and delivered it to him. Perlstein was to buy the stock; it was Perlstein who constituted the bank his own agent to buy the stock and who paid for it in the manner already indicated. The understanding between Perlstein and Moldawer was an unexecuted revocable arrangement between them, which was never carried out; and, as no delivery of the stock to Moldawer occurred, he has no claim upon it whatsoever, delivery being essential for the passage of title: In re Broomhall, Killough & Co., Inc., 47 F. (2d) 948; Uniform Stock Transfer Act of May 5, 1911, P. L. 126, sec. 1.

If we assume, however, for the sake of argument, that Moldawer did make Perlstein his agent for the purchase of the stock on his behalf, he still is not entitled to it, for an agent of an agent is not the agent of the latter's principal.

Delegata potestas non potest delegari. "If the agent, having undertaken to transact the business of his principal, employs a subagent on his own account to assist him in what he has undertaken to do, even though he does so with the *consent* of the principal he does so at his own risk, and there is no privity between such subagent and the principal. The subagent is, therefore, the agent of the agent only": 1 Mechem, Agency (2nd ed.), sec. 333.

See Chouteau Land & Lumber Co. v. Chrisman et al., 204 Mo. 371, cited in a note to the foregoing text, in which it was held that payment to the agent of an agent is not payment to the principal unless it is paid over by the subagent to the agent. The fact that Mr. White, the president of the bank, ordered the stock to be bought for the account of Moldawer does not control the question under consideration, because it is consistent with the assumption that the order was so given merely because he knew that Perlstein ultimately would deliver the stock to Moldawer. Such conduct in no way changed the fundamental relations of the parties and the character of the arrangement between Moldawer and Perlstein.

Whether Perlstein has any claim respecting the stock, as having been wrongly held as security for his loan from the bank, is a matter which lies between him and the bank and with which we have no concern at this time. The only claim before us is that of Moldawer. From October to March the bank and the Secretary of Banking held possession of the stock without any demand for it on his part, or any request by Perlstein for its delivery to Moldawer. Though both these persons assert they intended the stock to be Moldawer's, and looked upon it as such, their acts and omissions from the time it was bought until it was sold are inconsistent with ownership of it in Moldawer and are against all ordinary and reasonable experience in such transactions. It was only after the bank was closed and when the stock was about to be sold that Perlstein's brother-in-law set up his claim of ownership. Such a belated claim is, in the circumstances, subject to the gravest suspicion, and, when we review the transaction in its entirety, we have no hesitancy in concluding that, although Perlstein may have intended ultimately to give the stock to his brother-in-law in partial satisfaction of his private debt, this was not done either in fact or in law, and that the stock actually belonged to Perlstein.

The claim of William M. Moldawer for $2,075 is therefore disallowed and the petition for reclamation dismissed.

Accordingly, we enter the following decree nisi in the case:

And now, to wit, October 22, 1934, the second and partial account of the Secretary of Banking in possession of United States Bank & Trust Company having come on to be audited, the said account as modified by the rulings hereinbefore made is audited and confirmed absolutely, and the Secretary of Banking is authorized and directed to make distribution in accordance with the said account as modified.

The prothonotary will enter this decree nisi and give notice thereof to the parties or their counsel, and, unless exceptions are filed to the various rulings herein made within 10 days, any party may present a form of final decree to be entered in the case.